AVERN COHN

MAGISTRATE JUDGE KOMIVES

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ROBERT ROVNER, individually and on behalf of all others similarly situated, ) | C.A. No. |
| Plaintiff, ) | |
| v. ) | **JURY TRIAL DEMANDED** |
| FORD MOTOR COMPANY, JACQUES A. NASSER, and HELEN O. PETRAUSKAS ) | |
| Defendants. ) | |

00CV74233DT

00 SEP 22 PM 4:

FILED

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff, by his undersigned attorneys, individually and on behalf of the Class described below, upon information and belief, based upon, inter alia, the investigation of counsel, which includes, among other things, a review of public announcements made by Defendants, Securities and Exchange Commission ("SEC") filings made by Defendants, and press releases, except as to the paragraph applicable to the named Plaintiff which is alleged upon personal knowledge, brings this Complaint (the "Complaint") against Defendants named herein, and alleges as follows:

## SUMMARY OF ACTION

1.      This action is a securities fraud class action against the Ford Motor Company ("Ford" or the "Company") and certain of the Company's executive officers, alleging that statements regarding Ford's business, as contained in Ford's reports to shareholders, SEC filings

-1-

and other of its public disclosures during the period from January 21, 1999 to August 9, 2000, were materially false and misleading because the Company misled the investing public regarding the safety of the Ford Explorer in combination with Firestone tires, and failed to disclose the significant number of deaths, accidents, complaints and claims resulting therefrom, both in the United States and in foreign countries. An investigation initiated by the National Highway Traffic Safety Administration (the "Safety Administration") culminated in the announcement on August 9, 2000, that Firestone was voluntarily recalling its ATX, ATX II and Wilderness AT tires, which had been linked to over 103 deaths, 400 injuries and 2,226 complaints in the United States, and that Ford was participating in that recall.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78aa).

3.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), (c) and (d) because one or more of the Defendants resided, transacted business, were found, and/or had agents in this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

5.     In connection with the facts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## NATURE OF THE CLAIMS

6.     This lawsuit is brought as a class action on behalf of all persons and entities (other than Defendants and certain related persons and entities), who purchased Ford common stock ("common stock") from January 21, 1999 through August 9, 2000 (the "Class Period") and sustained a loss thereby (the "Class") to recover damages caused to Plaintiff and the Class by Defendants' violations of the federal securities laws.

7.     During the Class Period, Defendants engaged in a course of conduct that was designed to, and did: (i) deceive the investing public, including Plaintiff and other members of the Class, through the issuance of false and misleading statements concerning the safety and quality of the Company's products; (ii) artificially inflate the market price of Ford common stock during the Class Period; and (iii) cause Plaintiff and other Class members to purchase Ford common stock at artificially inflated prices.

8.     In furtherance of this plan and course of conduct, Defendants issued materially false and misleading statements in Ford's annual reports to shareholders, SEC filings and press releases regarding the safety and quality of Ford's products.  These statements were calculated to lead investors to believe that the Ford Explorer was safe, that its tires did not create an unacceptable risk of collision, and that any property damage or injuries caused by crashes involving Ford Explorers was merely an aberration from Ford's normally safe operations.

9.     During the time period in which Defendants made these statements, Defendants were aware of numerous prior instances of safety problems which had occurred in the United

States and in foreign countries with respect to Explorers equipped with Firestone tires. These safety problems were not yet matters of public knowledge. Defendants failed to disclose this information to the investing public during the time period in which Defendants made these statements.

10.     As a direct result of Defendants' wrongful conduct, Plaintiff and the members of the Class, in reliance upon the integrity of the market and the false and misleading statements made by Defendants, were induced to, and did, purchase shares of Ford common stock at artificially inflated prices and suffered damages as a result thereof. During the Class Period, Ford's common stock traded as high as $36.65 per share.[1] In response to Ford's and Firestone's massive recall of Firestone tires and dissemination of information concerning the significant amount of deaths, accidents, complaints and claims emanating from problems with Firestone tires in combination with the Ford Explorer, the price of the Company's stock gradually fell, closing at $24.1875 per share on September 1, 2000.

## PARTIES

11.     As detailed in the sworn Certification filed herewith, Plaintiff Robert Rovner purchased shares of Ford common stock during the Class Period at artificially inflated prices, and was damaged thereby.

12.     Defendant Ford Motor Company is a Delaware corporation, which maintains its principal executive offices at One American Road, Dearborn, Michigan 48126.

---

[1]   On August 8, 2000, a dividend distribution in the amount of $20.00 was issued for each share of Ford common stock. This stock price reflects the stock price after adjustment for the amount of the dividend distribution.

-4-

13.     Ford began as an automobile manufacturing company in Michigan in 1903, and was incorporated in Delaware in 1919. Ford is the world's largest truck maker and the second largest maker of cars and trucks combined, behind General Motors. Ford makes vehicles under the Aston Martin, Ford, Jaguar, Lincoln, Mercury and Volvo brands. In 1999, the Company sold 7.2 million vehicles throughout the world. The Ford Explorer, the world's most widely sold sports utility vehicle ("SUV"), was one of Ford's most important products. Ford sales and revenues from its automotive division in 1998 and 1999 were approximately $137 billion and $119 billion, respectively.

14.     The acts charged in this Complaint were ordered or done by Ford's officers, agents, employees, or representatives, while actively engaged in the management of the Defendants' affairs.

15.     Defendant Jacques A. Nasser was the President and Chief Executive Officer of Ford. He also signed the Company's 1999 Form 10K and 1998 Form 10K.

16.     Defendant Helen O. Petrauskas was Vice President - Environmental and Safety Engineering since March 1983.

17.     Nasser and Petrauskas are collectively referred to as the "Individual Defendants."

## CONTROL PERSON LIABILITY

18.     The Individual Defendants, by reason of their executive positions with Ford, Board membership, representations, actions alleged herein and/or their ownership of Ford securities, were controlling persons of the Company and had the power and influence, and exercised the same, to cause Ford to engage in the conduct complained of herein. Thus, the

Individual Defendants controlled the public dissemination of the false and misleading information and were controlling persons of the Company.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action on his behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities who purchased Ford common stock during the Class Period and sustained a loss thereby. Excluded from the Class are the Defendants named herein, members of the immediate family of each Individual Defendant, their heirs, successors and assigns, any subsidiary, affiliate, or division of Ford and the present and former officers of Ford and any subsidiary, affiliate or division thereof.

20.     Members of the Class are so numerous that joinder of all members is impracticable. Specifically:

a.      As of December 31, 1999, there were over 1.2 billion shares outstanding of Ford common stock; and

b.      Ford (symbol: "F") is listed and actively traded on the New York Stock Exchange, an efficient and developed securities market, and nearly 1.39 billion shares of common stock were traded during the Class Period.

c.      While the exact number of Class members is unknown to the Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of Class members who purchased Ford common stock in the open market at artificially inflated prices during the Class Period.

-6-

21. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages because of Defendants' unlawful activities alleged herein. Plaintiff has retained counsel competent and experienced in class and securities litigation and intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff. Plaintiff has no interests which are contrary to or in conflict with those of the Class which Plaintiff seeks to represent.

22. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

23. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a. whether Defendants violated Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder;

        b. whether Defendants participated in and pursued the common course of conduct complained of herein;

        c. whether documents, filings, releases and statements disseminated to the investing public omitted and/or misrepresented material facts about Ford;

        d. whether the market price of Ford common stock was artificially inflated throughout the Class Period due to the non-disclosures and/or misrepresentations complained of herein;

-7-

e.    whether Defendants acted knowingly, willfully, or recklessly in omitting

to state and/or misrepresenting material facts; and

f.    whether the members of the Class have sustained damages as a result of

Defendants' misconduct and, if so, the proper measure of such damages.

### SUBSTANTIVE ALLEGATIONS

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

24.    At all relevant times, the market for Ford common stock was an efficient market

for the following reasons, among others:

a.    Ford common stock met the requirements for listing, and was listed and

actively traded, on the New York Stock Exchange;

b.    As a regulated issuer, Ford filed periodic public reports with the SEC; and

c.    Ford stock was followed by securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales

force and certain customers of their respective brokerage firms.  Each of

these reports was publicly available and entered the public marketplace.

Among the securities firms that followed the Company during the Class

Period were Paine Webber, Morgan Stanley and Credit Suisse First

Boston.

25.    As a result, the market for Ford securities promptly digested current information

with respect to Ford from all publicly-available sources and reflected such information in Ford's

securities prices.  Under these circumstances, all purchasers of Ford securities during the Class

Period suffered similar injury through their purchase of securities at artificially inflated prices and a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

26.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading in this Complaint to the extent they were intended to be or could be construed as forward-looking in nature (the "forward-looking statements"). None of the forward looking statements pleaded herein were identified as forward-looking statements when made (either expressly or by implication). Nor was it stated that actual results could differ from those projected. Nor did meaningful cautionary statements identifying important factors that cause actual results to differ materially from those in the forward-looking statements accompany those forward-looking statements. Alternatively, to the extent that the statutory safe harbor does not apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those false forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer at Ford who knew that those statements were false when made.

## FACTUAL ALLEGATIONS

## BACKGROUND

27.    Throughout the Class Period, Firestone ATX, ATXII and Wilderness AT brand tires (the "tires") were included as standard equipment by Ford in certain of its cars, including the Ford Explorer, the nation's top-selling sport utility vehicle. As recent disclosures have shown,

-9-

tread separation, which is prevalent on the tires, makes the tires prone to bursting at high speeds, causing serious and fatal accidents.

28.     Additionally, as reported in a <u>Newsday</u> article dated August 31, 2000, based on a review of internal Ford documents, tests performed while designing the Ford Explorer in the late 1980's indicated that the Explorer had a tendency to roll over.[2] Rollovers account for ½ of all truck fatalities. Design modifications could make the Explorer safer, including widening the base width, altering the suspension system and lowering the center of gravity. But major design changes would take as much as 10 months, which would have delayed the March 1990 introduction Ford wanted in order to beat the competition. Rather than redesign the Explorer, Ford simply lowered the recommended air pressure to 26 psi in its Firestone tires. Lowering the pressure made the Explorer less likely to roll over when a driver swerved suddenly. Labelling on the tire's sidewall recommended 35 psi when carrying a maximum load. Lower tire pressure meant that the Explorer could carry less weight safely, since lower pressure puts more stress on the tires. More stress on tires leads to heat build up and, in the Firestone tires, the result was tread separation.

29.     As early as 1992, Firestone tires were the subject of complaints from Saudi Arabian motorists who were experiencing blowouts while driving Ford vehicles, Explorers in particular, equipped with the product. The <u>Atlanta Journal and Constitution</u> dated September 8,

---

[2]   Indeed, according to an article in the <u>Los Angeles Times</u> dated August 24, 2000, Ford knew, as early as May 1987, while development of the Explorer was still ongoing, that the SUV was prone to rollovers. As the article entitled "In a Rush to Meet Deadline, Car Maker Spurned Some Stabilizing Design Changes. It Recommended Lower Tire Pressure Instead" explained: "The biggest stability payoff - widening the track width - was among those that would have taken the longest and it was rejected."

2000, reporting on testimony at the House of Representative's Telecommunications Trade and Consumer Protection subcommittee on September 6, noted that Firestone had claims data from customers and insurers as early as 1992.

30.     By 1996, accidents resulting from the tires mounted on Ford Explorers were the subject of several reports in the United States. The most famous of these cases was that of television reporter, Stephen Gauvain. Mr. Gauvain was working on the road when the tread separated from one of his Ford Explorer's tires. Mr. Gauvain was thrown and killed as a result of the sudden separation. On or about September 5, 1996, the Houston Chronicle reported this incident, stating: "[W]itnesses said a left rear tire blew out, causing the vehicle to skid across a grassy area on the right and flip several times before coming to rest on its side."

31.     Ford had received direct warnings about the risks associated with Firestone tires as early as 1997, according to an article appearing in The Washington Post on September 6, 2000:

>Paul Wright, of a Ford-affiliated dealership in Saudi Arabia, wrote in October 1998 complaining of tire problems.
>
>    "As you know, this concern goes back to mid-1997 when we first notified you of this concern," Wright wrote. "I have to state that I believe this situation to be of a safety concern, which could endanger both the vehicle and more importantly the user of the vehicle. So I am asking what is going on? Do we have to have a fatality before any action is taken on this subject?"

32.     Rep. Billy Tauzin (R-La), chair of the House consumer protection subcommittee which is investigating the recall, stated that a 1998 letter from a Ford dealer about tire problems in Saudi Arabia evidenced Ford's knowledge of defects. The Dallas Morning News, September 7, 2000.

33.     Jon Harmon, a Ford spokesman, stated that Ford's first reports of problems with Firestone tires on its Explorers came in October 1998 in Venezuela, a full two years before Ford started replacing tires for its customers in the United States. The Washington Post, August 31, 2000; The New York Times, August 30, 2000; Los Angeles Times, August 30, 2000.

34.     As reported in The Atlanta Journal and Constitution on September 8, 2000, documents obtained by the House committee revealed that in 1999, "Ford was quietly replacing Firestone tires with Goodyear tires for Ford Explorer owners in Saudi Arabia. Some form of recall was under way in 16 foreign countries more than a year before the U.S. recall." Indeed, thousands of tires on SUVs sold in the Persian Gulf were replaced for free by Ford beginning in 1999.

35.     The New York Daily News dated September 8, 2000, reported that Ford corporate memoranda revealed that tire defects on Ford Explorers first surfaced in 1999 in Saudi Arabia and that "Firestone expressed 'major reservations' about a recall because it might have to notify U.S. regulators. Ford signaled it was leery about going public for the same reason."

36.     A memorandum dated January 12, 1999, from Ford's Venezuela operation also warned of tire safety problems on Ford Explorers more than 1-1/2 years before Ford announced the recall. The Times-Picayune, September 12, 2000.

37.     The Times Picayune reported in an article dated September 12, 2000, that Ford may have known as early as January 1999 about problems with the tires. A Ford email dated January 28, 1999, from Glenn Drake, head of Ford's Dubai, United Arab Emirates division to Melanie Gumz in Michigan stated:

We now have three cases and it is possible that Firestone is not telling us the whole story to protect them from a recall or lawsuit. . . . I feel it is possible and we owe it to our customers and our shareholders to investigate this for our own piece (peace) of mind. . . ."

38.     An article in The New York Times dated September 7, 2000, reporting on the

House investigation on September 6, reported:

Ford also gave House investigators today a complete copy of an internal memorandum from March 1999, describing how the company handled the replacement of problem Firestone tires on Ford Explorers in Saudi Arabia.  On Tuesday, Congressional investigators gave reporters a copy of the memo with one section previously blacked out by Ford.

That version showed that Firestone officials had been leery of sending a letter to tire owners in Saudi Arabia for fear that it might have to inform the United States Transportation Department and that it might be banned from the Saudi market.  "They feel that the U.S. D.O.T. will have to be notified of the program, since the same product is sold in the U.S.," the Ford memo said.

But in the section of the memo that was previously blacked out by Ford, the memo's author, a ford official named Chuck Seilnacht, mentioned that a colleague at Ford shared Firestone's worries.

Corey MacGillivray, an official in the general counsel's office at Ford, "was concerned about the implications," as well, the memo said.  "He was going to check with one of his colleagues to get more info."

39.     In February 2000, a Houston television station broadcast a report concerning

possibly defective Firestone tires on Ford Explorers which may have caused a number of deaths.

The New York Times, September 11, 2000.  That report prompted a federal investigation,

ultimately linking 103 deaths, at least 400 injuries and over 2,226 accidents to possible defects in

the Firestone tires installed on Ford Explorers.

-13-

40.     In March and April 2000, Ford replaced Firestone Tires on 160 Explorers in Thailand.  According to Mike Pease, executive director of Ford Sales and Service Thailand, the tires were replaced after problems were pointed out by Ford's own fleet drivers.  The New York Times, August 30, 2000.

41.     After years of serious accidents, some fatal, the National Highway Traffic Safety Administration undertook an effort to determine the gravity of the Firestone problem.  In this regard, on or about May 2, 2000, in response to an increasing number of allegations of tire failures, the Safety Administration opened an investigation.  As a result of its investigation, the Safety Administrations Office of Defect Investigation ("ODI") prepared an ODI Resume, which included a section entitled "Failure Report Summary" which stated in part:

> ODI is aware of 90 complaints on subject Firestone . . . tires alleging either separation or blowout.  The details of most incidents have been identified; however, some specifics are still unknown.  ODI is continuing to gather information about these and other incidents.
>
> Most drivers report that they were driving at highway speeds when suddenly they lost control.  Some drivers heard a loud noise seconds before the loss of control, but others heard nothing.  Those that did hear a noise often reported that the loss of control occurred so quickly they were not able to avoid a collision.  Over 30 percent of the drivers did not recover from the loss of control and crashed.
>
> After analyzing complaints and contacting consumers, ODI knows of 65 consumers alleging a complete (61) or partial (4) tire tread separation occurred on a subject tire.  An additional 17 allege a blow out occurred, which may or may not have been preceded by a tread separation.  The remaining either indicate unspecified tire failures.  Twenty-eight of the drivers who experienced an alleged tread separation noted that the tire remained inflated, often after a subsequent crash.  In fact, 22 of the 28 cases resulted in a crash.  In two of these crashes, the tread wrapped itself around the rear axle, allegedly causing a wheel lockup and the resultant crash.

> Forty-one of the complainants reported a tire tread separated while traveling at speeds ranging from 50 to 75 mph, with 70 mph being the most commonly reported speed, cited by 18 drivers.

42. Shortly after the Safety Administration began its investigation, Ford began to respond to non-United States consumers with respect to their numerous complaints concerning the serious incidents of tire blowouts that had occurred with respect to the tires included as standard equipment on its popular Explorer vehicle. On August 1, 2000, the <u>Chicago Sun-Times</u> reported on Ford's limited response:

> Ford Motor Co. has begun replacing Firestone tires on its Explorer models in some South American countries where the tires have ripped apart beneath vehicles, causing crashes and rollovers.
>
> The same brand of tires on Explorers in the United States has been blamed for more than 30 deaths and 75 accidents and prompted a federal investigation.
>
> But no similar replacement effort is planned. That lack of action is "criminal," said Joan Claybrook, president of Public Citizen, a consumer group in Washington, D.C.
>
> "There's been so many deaths and injuries we've heard about, and so many more that are undocumented - they should have an immediate explanation for why they aren't doing anything here," said Claybrook.

43. On or about August 7, 2000, the <u>Chicago Sun-Times</u> published an article urging Ford to take reports in the United States just as seriously as reports regarding tires sold abroad:

> Too bad Ford Motor Co., which uses [the tires] on its top-selling Explorer sport-utility vehicle, is not taking similar precautions to protect its U.S. customers.
>
> We emphasize American customers because Ford has begun replacing Firestone tires on vehicles sold in at least 10 foreign countries, even as the automaker and a federal agency conduct separate investigations into tire safety.

-15-

44.     Following the investigation by the National Highway Traffic Safety Administration, Firestone announced on August 9, 2000, that it was recalling the tires. The recall involved at least 6.5 million tires. When the recall announcement by Firestone was made, Ford announced that it would participate in providing substitute tires. The announcement by Ford ignited a decline in Ford stock prices, which continued for several weeks and was exacerbated by the subsequent revelations clearly indicating that Ford shared culpability.

45.     As reported by The New York Times on August 10, 2000, Ford reported that it become aware of the problem "a year ago, with 'anecdotal reports' from Saudi Arabia, where drivers let air out of the tires to drive on the desert, then returned to paved roads and drove at high speeds without reinflating the tires."

46.     In the weeks following the recall announcement, congressional investigations uncovered documents revealing that Ford was aware several years earlier of a problem, both in the U.S. and in foreign countries, with the Ford Explorer equipped with the Firestone tires at issue. Accordingly, as more information was revealed to the public concerning when Ford became aware of the problem, the stock of Ford continued to languish in the $25 range.

47.     On August 21, 2000, Ford announced it would shut down production at three plants for two weeks in order to divert 70,000 tires to be used in the recall. The shutdown would result in a delay in manufacturing 15,000 Ranger at Ford's Minnesota and New Jersey plants, and 10,000 Explorers and Mountaineers at Ford's Missouri plant. In addition, the production stoppage would idle 6,000 workers during the two-week period, who would receive 95% pay. As reported in The Washington Post on August 22, 2000, David Healy, an auto industry analyst with Burnham Securities stated that the decision "will reduce Ford's third-quarter earnings by $100

-16-

million to $200 million, putting them as much as 14 percent below expectations before yesterday's announcement."

48.     In a conference call with financial analysts on August 21, Ford officials stated that sales of Explorers had begun to lag, and that the company expected sales to be about 3% less than its previously stated goal of about 42,000 sold during August. The Washington Post, August 22, 2000.

49.     On August 29, 2000, David Garrity, securities analyst for Dresdner Kleinwort Benson, cut his rating to "add" from "buy" due to Ford's recall of 46,000 Explorers overseas before its recall in the United States, citing Ford's loss of credibility with investors. Chicago Tribune, August 30, 2000.

50.     In September 2000, the United States Congress launched an investigation of Ford and Bridgestone/Firestone.

51.     As reported in the Sacramento Bee on September 7, 2000:

> Tauzin said internal Ford documents show that in August 1996, four years before the recall, a Ford dealer complained to the company over its service hot line about tire problems on the Explorer.
>
> Another internal Ford document, according to Tauzin, showed that Ford was notified last September through company channels that there were 32 claims traced to defective tires.

52.     As reported in The Houston Chronicle on September 7, 2000, documents obtained by the Associated Press indicated that Ford may have been aware of a problem as early as 1997, "contradict[ing] claims by Ford and Firestone that no analysis was done on the tires until July and August."

-17-

53.    According to a <u>The New York Times</u> report dated September 8, 2000, the Venezuelan government recommended that criminal charges be brought against both Ford and Firestone, "citing what it described as evidence that both Firestone and Ford were aware of defects in their products." Firestone has recalled 62,000 tires in Venezuelan, after more than 60 deaths caused by blowouts on Ford Explorers.

54.    In an SEC filing dated September 8, 2000, Ford stated that the recall of 6.5 million Firestone tires would reduce revenues and increase costs, but that it was too early to calculate the overall impact on the Company's financials.

55.    Approximately 2/3 of the tires recalled were standard equipment on Ford sport utility vehicles, in particular the Ford Explorer. Ford joined in the recall, initially alleging it had just learned of problems several days before the recall. In the "Statement of Jac Nasser, Chief Executive Officer, Ford Motor Company, September 12, 2000 - Prepared for Delivery" appearing on the Company' website, Mr. Nasser stated:

> Ford did not know that there was a defect with the tires until we
> virtually pried the claims data from Firestone's hands and analyzed
> it ourselves. It was only then – a few days before the recall was
> announced – the Ford engineers discovered conclusive evidence
> that the tired were defective. We demanded that Firestone pull the
> tires from the road.

56.    As reported in a <u>Los Angeles Times</u> article dated September 12, 2000, the House Commerce Committee released documents indicating that Ford "failed to heed early warnings about the safety problem." In addition, the article stated:

> Congressional hearings last week established that both Ford
> and Firestone knew of problems well before they were reported to
> federal safety agencies. . . . Ford conducted recalls of Firestone
> tires on Explorers sold in Saudi Arabia and other Middle Eastern
> countries without informing the U.S. safety agency. . . . An

-18-

executive of a Ford dealer in Saudi Arabia angrily wrote the company in 1999 that tire failures were "beginning to become an epidemic." John Garthwaite, national service director of Al Jazirah Vehicles, dismissed corporate efforts to blame the failures on rough local conditions as "a smoke screen."

Earlier in September 2000, a California judge concluded in a class action lawsuit involving failure of ignition systems on Ford cards that Ford had engaged in a huge coverup, "concealing from regulators and consumers a design flaw affecting 22 million cars produced between 1983 and 1995. . ." Accordingly, Congress is now examining whether there is a "broader pattern in which Ford misled regulators by failing to disclose what its engineers and safety experts know of possible defects." The New York Times, September 12, 2000.

57.    United States lawmakers have taken the unusual step of publicly criticizing both Ford and Firestone for not alerting customers sooner. As reported by The New York Times on September 13, 2000, the recall has seriously injured Ford's prospects and as many as one out of every four people polled said the recall was extremely likely to affect their decision to buy a Ford product.

58.    Ford admitted to Congressional investigators that the Company did not conduct durability tests of the Firestone tires on the Ford Explorer before the top-selling SUVs went into production. The Associated Press reported on September 21, 2000, that Ford initially denied Representative Tauzin's claims that Ford never tested the fires mounted on the Explorer and inflated to the Company's recommended 26 psi, but the Company later acknowledged that the testing was not conducted on an actual Ford Explorer.

-19-

## DEFENDANTS' MISLEADING STATEMENTS AND OMISSIONS AND THE FALSITY OF THOSE STATEMENTS

59.   On January 21, 1999, the Company issued a news release carried on <u>AP Online</u> regarding its fiscal year 1998 fourth quarter results.  The news release quoted Defendant Nasser as stating:

> "The transformation of Ford continued to gain momentum in 1998," said Jac Nasser, president and chief executive.  "Our quality is the best it has ever been, we improved our operating efficiency and our products continue to be well-received by our customers."

60.   Defendant Nasser's statement, particularly as it pertained to quality, was materially misleading.  In truth, as Defendant Nasser knew or recklessly disregarded, Ford failed to disclose:

(a) that the tires mounted as standard equipment on the Ford Explorer - one of Ford's core products and the most popular SUV in the world - were at risk for tread separation, which makes the tires prone to bursting at high speeds;

(b) that the tires created an unacceptable risk of collision and/or rollover, posing a serious risk of accidents, injuries and fatalities;

(c) by 1998, Ford knew of problems with the tires mounted on the Ford Explorer in Saudi Arabia and Venezuela.

61.   In the Chief Executive Officer's Message to Shareholders and Consumers dated March 11, 1999, included in the 1998 Annual Report to Shareholders, Defendant Nasser stated "Our quality is the best ever."  He also declared that the Company's rallying cry is "Cleaner, Safer, Sooner."

62.     Defendant Nasser's statement, particularly as it pertained to quality, was materially misleading.  Quality was not the best ever.  In fact, as Defendant Nasser knew or recklessly disregarded, Ford failed to disclose:

(a) that the tires mounted as standard equipment on the Ford Explorer - one of Ford's core products and the most popular SUV in the world - were at risk for tread separation, which makes the tires prone to bursting at high speeds;

(b) that the tires created an unacceptable risk of collision and/or rollover, posing a serious risk of accidents, injuries and fatalities;

(c) by 1998, Ford knew of problems with the tires mounted on the Ford Explorer in Saudi Arabia and Venezuela.

63.     On or around March 17, 1999, the Company filed its Form 10K for the fiscal year ended December 31, 1998 (the "1998 Form 10K").  The 1998 Form 10K was signed by Defendant Nasser.  In its 1998 Form 10K, the Company stated that its market share was influenced, inter alia, by "how our products compare with those offered by other manufacturers based on many factors, including design, driveability, price, quality, reliability, safety and utility."

64.     The 1998 Form 10K also stated that profitability of sales is affected by many factors, including "the margin of profit on each vehicle sold . . . [and ]the costs for customer warranty claims and other customer satisfaction actions."

65.     The Company's statements contained in its 1998 Form 10K were false and misleading because Ford omitted to state that there was an unacceptably high risk that:

(a) a product recall would be required to replace the tires on the Ford Explorers throughout the world, including in the United States;

(b) any such recall could potentially involve significant cost, loss of market share and could interrupt manufacture of cars for a significant amount of time;

(c) Ford could suffer material damage to its reputation for safety and to its credibility in the event such a recall took place, thus impairing sales.

66.    The Company stated in its 1998 Form 10K that engineering, research and development resources are directed "primarily to improve the performance (including fuel efficiency), safety and customer satisfaction of our products, and to develop new products. We also have staffs of scientists who engage in basic research. We maintain extensive engineering, research and design facilities for these purposes. . . ," which in large part relate to Ford's automotive division.

67.    Ford's statements made in its 1998 Form 10K were false and misleading because there were significant lapses in its safety testing. In particular, Ford had failed to adequately test the Firestone tires on its Explorers for safety. In fact, the Company did not perform any durability tests of the tires on the Ford Explorer as it should have done before the world's best-selling SUV went into production and did not perform tests at the recommended tire pressure of 26 psi.

68.    On July 14, 1999, the Company issued a press release carried on The Associated Press State & Local Wire regarding its fiscal year 1999 second quarter results. The news release quoted Defendant Nasser as stating: "Our strong earnings momentum over the last 13 quarters is the result of our intense drive to improve quality, lower costs and become more nimble."

-22-

69.     Defendant Nasser's statement, particularly as it relates to the Company's "intense drive to improve quality [and] lower costs" was materially misleading.  In reality, Defendant Nasser knew or recklessly disregarded:

(a) that the tires mounted as standard equipment on the Ford Explorer - one of Ford's core products and the most popular SUV in the world - were at risk for tread separation, which makes the tires prone to bursting at high speeds;

(b) that the tires created an unacceptable risk of collision and/or rollover, posing a serious risk of accidents, injuries and fatalities;

(c) by 1998, Ford knew of problems with the tires mounted on the Ford Explorer in Saudi Arabia and Venezuela;

(d) Ford had failed to adequately test the Firestone tires on its Explorers for safety. In particular, the Company did not perform any durability tests of the tires on the Ford Explorer as it should have before the world's best-selling SUV went into production.

70.     A press release dated October 15, 1999, issued over Universal News Services, outlined the Company's new consumer-focused organization and included details of its initiative "Ford 2000."  The release stated that "Ford increased its product offerings, improved quality and productivity, reduced total costs by more than $5 billion and achieved 13 consecutive quarters of improved profits."  Defendant Nasser was quoted as stating that the new consumer-focused organization which will "drive performance and accountability further down into the organisation. . . ."  In addition, the Company stated that "There will continue to be global organisations for product development and quality. . . ."

-23-

71.    The Company's statement, in particular that it had improved quality, was false and materially misleading, since the Company ignored its quality standards at least with respect to the Ford Explorer, a very important product for Ford, and the top-selling SUV in the world, as evidenced by the fact that:

(a) that the tires mounted as standard equipment on the Ford Explorer - one of Ford's core products and the most popular SUV in the world - were at risk for tread separation, which makes the tires prone to bursting at high speeds;

(b) that the tires created an unacceptable risk of collision and/or rollover, posing a serious risk of accidents, injuries and fatalities;

(c) by 1998, Ford knew of problems with the tires mounted on the Ford Explorer in Saudi Arabia and Venezuela.

72.    A press release issued over PR Newswire on December 21, 1999, stated that the Company was starting a new radio advertising campaign, as part of its corporate commitment to safety. The press release stated:

> The new safety advertisements are part of Ford Motor Company's broad commitment to safety. In addition to public awareness programs, the company has introduced several industry-first technologies on its vehicles:
>
> - Ford was the first automaker to offer depowered air bags on all its vehicles beginning in the 1998-model year.
>
> - The Ford Taurus and Mercury Sable now feature the industry-leading Personal Safety System which uses sensors to analyze conditions at the time of an impact and automatically deploys the most suitable safety devices for the given crash situation. The system features dual stage air bags for the driver and front-seat occupant.

-24-

- The company is now introducing the BeltMinder™ system on all its U.S. vehicles. BeltMinder™ provides intermittent visual and audio signals to help a driver remember to wear his or her safety belt.

73.    The Company's statement regarding its "broad commitment to safety" was materially misleading. In fact, the Company suffered serious safety lapses, in particular with respect to its Ford Explorer. In addition, Defendants knew or recklessly disregarded:

(a) that the tires mounted as standard equipment on the Ford Explorer - one of Ford's core products and the most popular SUV in the world - were at risk for tread separation, which makes the tires prone to bursting at high speeds;

(b) that the tires created an unacceptable risk of collision and/or rollover, posing a serious risk of accidents, injuries and fatalities;

(c) by 1998, Ford knew of problems with the tires mounted on the Ford Explorer in Saudi Arabia and Venezuela;

(d) Ford had failed to adequately test the Firestone tires on its Explorers for safety. In particular, the Company did not perform any durability tests of the tires on the Ford Explorer as it should have before the world's best-selling SUV went into production.

74.    On January 6, 2000, Ford announced the introduction of the Explorer Sport Trac which would be available for sale in late January 2000. In its press release which was carried on PR Newswire, the Company stated that "[l]ike all Ford vehicles, safety on the Explorer Sport Trac was a priority throughout its development." The Company also stated that the Explorer Sport Trac was designed specifically to appeal to customers that wanted the "comfort, safety, and image" of an SUV.

-25-

75.     The Company's statement, as it pertained to safety being a priority on all Ford vehicles, was materially misleading.  In fact, safety was never a priority throughout development, manufacture and sale of the Ford Explorer.  In addition, Defendants failed to disclose that:

(a) that the tires mounted as standard equipment on the Ford Explorer - one of Ford's core products and the most popular SUV in the world - were at risk for tread separation, which makes the tires prone to bursting at high speeds;

(b) that the tires created an unacceptable risk of collision and/or rollover, posing a serious risk of accidents, injuries and fatalities;

(c) by 1998, Ford knew of problems with the tires mounted on the Ford Explorer in Saudi Arabia and Venezuela;

(d) Ford had failed to adequately test the Firestone tires on its Explorers for safety. In particular, the Company did not perform any durability tests of the tires on the Ford Explorer as it should have before the world's best-selling SUV went into production.

76.     During the Class Period, Ford and the Individual Defendants learned that, as a result of the safety problems with the Ford Explorer, the Company would likely be subject to scrutiny by the Safety Administration which would subject them to a massive recall, drive up costs and possibly force a redesign of the Ford Explorer.  Despite this knowledge, Defendants made numerous statements about Ford and its business that failed to disclose the true scope of the Company's severe safety problems and resultant business risks.  Eventually, Defendants were forced to reveal the true extent of the Company's safety problems when it agreed to participate in the recall with Firestone.

77.    Throughout the Class Period, Defendants represented to the investing public that Ford was committed to running a safe automotive company and had one of the safest records of any automotive company. In fact, Ford and its Ford Explorer equipped with Firestone tires had an unsatisfactory safety record. In addition, the Company possessed a corporate culture inconsistent with the highest level of safety and failed to address numerous safety problems it had identified. These materially false and misleading statements artificially inflated the price of Ford stock.

78.    In its Annual Report to Shareholders dated March 9, 2000, the company stated:

> Around the world, Ford Motor Company continues to enrich its reputation among consumers as a source of top-quality, dependable automotive products and services, and as a responsible citizen everywhere we do business.

> * * *

> To this end, the Company employs management techniques such as Consumer-Driven Six Sigma, a breakthrough management strategy that produces things shareholders want – better margins and lower costs – by delivering something consumers want – high-quality products with fewer defects.

The Annual Report also stated that the Company was producing a series of books explaining to employees its sources of competitive advantage: "strong global brands, superior customer satisfaction and loyalty, best total value to the customer, nimble organization with leaders at all levels and corporate citizenship."

79.    The Company's statement in its 1999 Annual Report to Shareholders was materially misleading, particularly as it pertained to the quality of its best-selling SUV, the Ford

-27-

Explorer. In truth, as Defendants knew or recklessly disregarded, the quality of its Ford Explorer was jeopardized by the fact that:

(a) the tires mounted as standard equipment on the Ford Explorer - one of Ford's core products and the most popular SUV in the world - were at risk for tread separation, which makes the tires prone to bursting at high speeds;

(b) the tires created an unacceptable risk of collision and/or rollover, posing a serious risk of accidents, injuries and fatalities;

(c) by 1998, Ford knew of problems with the tires mounted on the Ford Explorer in Saudi Arabia and Venezuela;

(d) a significant risk existed that a product recall would be required to replace the tires on the Ford Explorers throughout the world, including in the United States;

(e) any such recall could potentially involve significant cost, loss of market share and could interrupt manufacture of cars for a significant amount of time;

(f) Ford could suffer material damage to its reputation for safety and to its credibility in the event such a recall took place, thus impairing sales;

(g) the pervasive safety problems with the Ford Explorer due to the tires as well as the SUV's propensity to roll over, exposed the Company to the potential for tens of millions of dollars in liability from lawsuits brought by accident victims and their families and posed significant risk that the Ford Explorers would be involved in more fatal accidents

(h) Ford had failed to adequately test the Firestone tires on its Explorers for safety. In particular, the Company did not perform any durability tests of the tires on the Ford Explorer as it should have before the world's best-selling SUV went into production.

-28-

80.   The 1999 Annual Report to Shareholders boasted:

> I am Ford Motor Company . . .
>
> \* \* \*
>
> I constantly think about safety. I can sense a rollover. I measure the amount of vehicle roll or tilt, process this information, then trigger inflatable side curtain air bags. I do all this in a fraction of a second. I deploy airbags through the SUV's headliner trim to help protect those in both the front- and second-row seats. I keep the bags inflated for up to six seconds. I am one of the most advanced protection packages in the world. I help protect people in a rollover. I can save lives.

81.   The Company's statement in its 1999 Annual Report to Shareholders was materially misleading, particularly as it pertained to the quality of its best-selling SUV, the Ford Explorer. In truth, as Defendants knew or recklessly disregarded, the quality of its Ford Explorer was jeopardized by the fact that:

(a) the tires mounted as standard equipment on the Ford Explorer - one of Ford's core products and the most popular SUV in the world - were at risk for tread separation, which makes the tires prone to bursting at high speeds;

(b) the tires created an unacceptable risk of collision and/or rollover, posing a serious risk of accidents, injuries and fatalities;

(c) by 1998, Ford knew of problems with the tires mounted on the Ford Explorer in Saudi Arabia and Venezuela;

(d) a significant risk existed that a product recall would be required to replace the tires on the Ford Explorers throughout the world, including in the United States;

-29-

(e) any such recall could potentially involve significant cost, loss of market share and could interrupt manufacture of cars for a significant amount of time;

(f) Ford could suffer material damage to its reputation for safety and to its credibility in the event such a recall took place, thus impairing sales;

(g) the pervasive safety problems with the Ford Explorer due to the tires as well as the SUV's propensity to roll over, exposed the Company to the potential for tens of millions of dollars in liability from lawsuits brought by accident victims and their families and posed significant risk that the Ford Explorers would be involved in more fatal accidents

(h) Ford had failed to adequately test the Firestone tires on its Explorers for safety. In particular, the Company did not perform any durability tests of the tires on the Ford Explorer as it should have before the world's best-selling SUV went into production.

82.    The Company's Form 10K for the fiscal year ending December 31, 1999, was filed with the SEC on or about March 16, 2000 (the "1999 Form 10K), and was signed by Defendant Nasser.

83.    In its 1999 Form 10K, the Company stated that its market share was influenced, inter alia, by "how our products compare with those offered by other manufacturers based on many factors, including design, driveability, price, quality, reliability, safety and utility."

84.    The 1999 Form 10K stated that profitability of sales is affected by many factors, including "the margin of profit on each vehicle sold . . . [and ]the costs for customer warranty claims and other customer satisfaction actions."

85.     The Company's statements, detailed in paragraphs 84 and 85, concerning its

market share and the profitability of sales, were materially misleading because the Company

omitted to disclose that:

(a) a significant risk existed that a product recall would be required to replace the

tires on the Ford Explorers throughout the world, including in the United States;

(b) any such recall could potentially involve significant cost and could interrupt

manufacture of cars for a significant amount of time;

(c) Ford could suffer material damage to its reputation for safety and to its

credibility in the event such a recall took place, thus impairing sales.

86.     The Company stated in its 1999 Form 10K that engineering, research and

development resources are directed "primarily to improve the performance (including fuel

efficiency), safety and customer satisfaction of our products, and to develop new products. We

also have staffs of scientists who engage in basic research. We maintain extensive engineering,

research and design facilities for these purposes. . . ," which in large part relate to Ford's

automotive division.

87.     Ford's statements made in its 1999 Form 10K were false and misleading because

there were significant lapses in its safety testing. In particular, Ford had failed to adequately test

the Firestone tires on its Explorers for safety. In fact, the Company did not perform any

durability tests of the tires on the Ford Explorer as it should have done before the world's best-

selling SUV went into production and did not perform tests at the recommended tire pressure of

26 psi.

-31-

88.    On April 18, 2000, Ford announced a three-year agreement with Nickelodeon, to educate children and their parents about automobile safety. The Company stated: "Educating our customers and families about safety is a responsibility Ford takes very seriously."

89.    Defendants' statement, particularly as it pertained to educating consumers about safety, was materially misleading. The Company knew or recklessly disregarded that there were serious safety concerns with its Ford Explorer and failed to disclose:

(a) that the tires mounted as standard equipment on the Ford Explorer - one of Ford's core products and the most popular SUV in the world - were at risk for tread separation, which makes the tires prone to bursting at high speeds;

(b) that the tires created an unacceptable risk of collision and/or rollover, posing a serious risk of accidents, injuries and fatalities;

(c) by 1998, Ford knew of problems with the tires mounted on the Ford Explorer in Saudi Arabia and Venezuela;

(d) a significant risk existed that a product recall would be required to replace the tires on the Ford Explorers throughout the world, including in the United States;

(e) Ford had failed to adequately test the Firestone tires on its Explorers for safety. In particular, the Company did not perform any durability tests of the tires on the Ford Explorer as it should have before the world's best-selling SUV went into production.

90.    In a nationally-televised ad campaign that aired beginning August 20, 2000, Nasser stated "I want all of our owners to know that there are two things that we never take lightly: your safety and your trust." The Washington Post, August 22, 2000.

-32-

## SCIENTER

91.    Throughout the Class Period, the Individual Defendants were aware, or recklessly disregarded, that, since at least as early as 1998, problems existed in the United States and in foreign countries with respect to the installation of Firestone tires on Ford Explorers, resulting in tread separation, vehicle rollovers, collisions, serious bodily injury and, in some cases, death. Notwithstanding their knowledge of these facts, the Individual Defendants failed to truthfully disclose the true circumstances regarding Ford's business.  Throughout the Class Period, each of the Individual Defendants was aware that the statements being made by Ford and Defendants regarding, *inter alia,* Ford's quality and safety  were materially false and misleading, because their statements failed to disclose the safety problems being experienced in the U.S. and foreign countries with Ford Explorers equipped with Firestone tires, including:

(a) the fact that recalls occurred in Saudi Arabia during 1999;

(b) the fact that recalls occurred in Venezuela during 2000;

(c) the fact that the Company recommended underinflated tires to avoid the known risk of rollovers;

(d) the fact that Ford failed to adequately test the Firestone tires on its Explorers for safety, by failing to perform durability tests of the tires on the Ford Explorer as it should have before the Explorers went into production; and

(e) the likelihood of massive recalls, the concomitant expense associated therewith and the risk of loss of market share in the SUV market. All of the Individual Defendants knew or were grossly reckless in not recognizing that Ford's public statements regarding quality and safety were blatantly false in light of the deaths, accidents, complaints and

-33-

claims experienced during the Class Period. Notwithstanding their positions of control and authority as members of the Board and/or senior management, each Individual Defendant named herein failed to use his or her position of control and authority to reveal the truth about Ford's business practices.

92.    The Individual Defendants knew of, or recklessly disregarded, the adverse, non-public information alleged herein about Ford's business and operations, the safety of its vehicles, and present and future business prospects because their executive and/or directorial positions provided them with access to internal corporate documents and information (including the Company's testing, design and safety information), and allowed them to have conversations and meetings with other corporate officers and employees. The Individual Defendants attended meetings of the management and/or Board of Directors and committees thereof, and received internal reports and other information in connection therewith.

93.    The Individual Defendants engaged in a scheme, common enterprise or common course of conduct to artificially inflate and/or maintain the price of Ford stock by, inter alia, issuing materially false and misleading statements, reports and press releases to the public regarding the Company's business, operations and future prospects. These statements and documents portrayed a false picture of the Company's business and operations and misrepresented and/or failed to disclose material, adverse facts concerning Ford business, revenues, earnings, management, financial condition, safety, quality and future prospects.

94.    The purpose, effect and motive of the Individual Defendants' actions were to, inter alia: (a) deceive the investing public, including Plaintiffs and members of the Class; (b) artificially inflate and/or maintain the market price of Ford common stock during the Class

-34-

Period; and (c) cause Plaintiffs and members of the Class to purchase Ford common stock at artificially inflated prices during the Class Period. Each Individual Defendant was a direct, necessary and substantial participant in the scheme and common course of conduct complained of herein.

## COUNT I

### FOR VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

95.    Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein, and asserts these claims against all Defendants.

96.    During the Class Period, Defendants, individually and in concert, engaged in a plan, scheme and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon Plaintiff and other members of the Class, and made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not  misleading, to Plaintiff and other Class members as set forth above. The purpose and effect of said scheme was to induce Plaintiff and the members of the Class to purchase the Company's common stock during the Class Period at artificially inflated prices.

97.    By reason of the foregoing, the Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they themselves or a person whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary

in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with his purchase of the Company's common stock during the Class Period.

98.     Each of the Defendants participated in and joined the alleged scheme and course of conduct specified above and each is liable primarily for the aforesaid wrongful acts and statements specified above.

99.     The Individual Defendants are liable under Section 20(a) as control persons since, by virtue of their executive position, their knowledge of and involvement in the Company's business, and/or power and ability to make public statements on behalf of the Company to shareholders, potential investors and the media, they had the power and ability to control the actions of the Company.

100.     As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the representations described above, Plaintiff and other members of the Class relied, to their damage, directly on the misstatements or on the integrity of the market both as to price and as to whether to purchase these securities.  Plaintiff and the other members of the Class would not have purchased Ford  stock at the market prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' false and misleading statements and concealments.  At the time of the purchase of Ford common stock by Plaintiff and the other members of the Class, the fair market value of said common stock was substantially less than the price paid by Plaintiff.

-36-

101.    The price of the Company's common stock declined materially upon the public disclosure of the facts that had been misrepresented or omitted as alleged in this Complaint. Plaintiff and other members of the Class have suffered substantial damages as a result.

WHEREFORE, Plaintiff, on behalf of himself and on behalf of the Class, prays for judgment as follows:

A.    Declaring this action to be a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Plaintiff and the members of the Class rescissory, compensatory and/or punitive damages in an amount which may be proven at trial, together with interest thereon;

C.    Awarding Plaintiff and the members of the Class, prejudgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure Plaintiff has an effective remedy.

Dated: September 22, 2000

MILLER FAUCHER AND CAFFERTY LLP

By_____
Patrick E. Cafferty (P35643)
101 North Main Street
Ann Arbor, Michigan 48104
(734) 769-2144

-37-

BERGER & MONTAGUE, P.C.

By _____
Sherrie R. Savett
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

-38-

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: September 22, 2000

MILLER FAUCHER AND CAFFERTY LLP

By _____

Patrick E. Cafferty (P35613)
101 North Main Street
Ann Arbor, Michigan 48104
(734) 769-2144

BERGER & MONTAGUE, P.C.

By _____

Sherrie R. Savett
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

## CERTIFICATION OF ROBERT ROVNER
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Robert Rovner, duly swear and say, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed a complaint forwarded to me by my attorneys alleging violations of the federal securities laws against Ford Motor Company and others, and I approve of its contents.

2.     I did not purchase or acquire any of the securities that are the subject of this action at the direction of counsel or in order to participate in this private action.

3.     I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     On May 22, 2000, I purchased 1,000 shares of Ford Motor Company common stock at a price of $51-1/2 per share ($31 1/2 as adjusted).

5.     I have not sought to serve as a class representative in other actions filed under the federal securities laws in the past three (3) years preceding the date on which this certification is signed.

6.     I have not and will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of September 2000, at Philadelphia, Pennsylvania.

BY: _____
          Robert Rovner